- IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

VICKI JOHNSON,

               Plaintiff,

     v.

UNITED OF OMAHA LIFE INSURANCE
COMPANY,

               Defendant.

**8:11CV296**

**MEMORANDUM AND ORDER**

This matter is before the court on the defendant's motion for summary judgment, Filing No. 31, and the plaintiff's motions for summary judgment or, in the alternative, judgment on the administrative record, Filing No. 46, and to strike the declaration of Molly Kuehl, Filing No. 40.[1]  This is an action for judicial review of an administrative determination denying benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1101 *et seq.*  The plaintiff alleges she was wrongfully denied long-term disability benefits under an employer-sponsored disability insurance plan purchased by her employer from defendant United of Omaha of Omaha Life Insurance Co. ("United of Omaha").

The administrative record has been filed.  Filing No. 32, Index of Evid., Ex. 1(B), Administrative Record ("Admin. Rec."), Part I (AR 1 to AR 424) (Doc # 32-3, Page ID # 137-560); Part II (AR 425 to AR 623) (Doc # 32-4, Page ID # 561-759); Part III (AR 624-28) (Doc # 32-5, Page ID # 760-64) (citations to evidence in the record will refer to the Bates-labeled page numbers preceded with "Johnson AR" on the lower right corner of

---

[1] Defendant submits the declaration of Molly Kuehl as foundation for its exhibits and to support its contention that the defendant was not operating under a conflict of interest.  Filing No. 52, Index of Evid., Ex. 1, Declaration of Molly Kuehl.  Because the resolution of the conflict-of-interest issue is a question of law, the court will not consider Ms. Kuehl's declaration in connection with the issue.  The court finds it is not necessary to strike the declaration and the plaintiff's motion to strike will be denied as moot.

the documents).  An index of the Bates-labeled documents is filed as Ex. 1(A) (Doc #32-2).  Also, the plaintiff was granted leave to supplement the record to include the plaintiff's long-term disability ("LTD") claim form.  Filing No. 42, Motion to Expand the Record, Exs. 1 & 2, LTD claim form, AR 628-39 (Doc #48-1, Page ID #891-901).  United of Omaha agrees that the claim form should be part of the record.  *See* Filing No. 51, text order granting unopposed motion to expand.  Accordingly, the matter is ripe for resolution on the record.

## I.  FINDINGS OF FACT

### A.  Plan Terms

The employee benefits plan at issue is a disability insurance policy ("the Policy" or "the Plan") issued by defendant United of Omaha to Johnson's employer, Colorado Real Estate.  Filing No. 32, Index of Evid., Admin. Rec., Part I at AR 1-48.  A Summary Plan Description, which is required under ERISA, appears at pages 28 to 30 of a "Group Long-Term Disability Insurance Summary of Coverage" booklet.  *Id.*, AR 48-51.  The Summary of Coverage provides that "[i]n the event of a discrepancy between this Summary of Coverage and the Certificate, the Certificate will control" and further states: "This Summary of Coverage is not a contract.  You are not necessarily entitled to insurance under the Policy because You received this Summary of Coverage.  You are only entitled to insurance if You are eligible in accordance with the terms of the Certificate."  *Id.*, AR 14.  The "Standard Provisions" section of the Summary of Coverage provides that the "Insurance Contract consists of (a) the policy; (b) the Policyholder's application attached to the policy; and (c) your application, if required.

*Id.,* AR 48.  The Summary Plan Description, under the heading "AUTHORITY TO INTERPRET POLICY," provides:

> By purchasing the Policy, the Policyholder [Colorado Real Estate] grants Us [United of Omaha] the discretion and the final authority to construe and interpret the Policy.  This means that We have the authority to decide all questions of eligibility and all questions regarding the amount and payment of any Policy benefits within the terms of the Policy as interpreted by Us.  Benefits under the Policy will be paid only if We decide, in Our discretion, that a person is entitled to them.  In making any decision, We may rely on the accuracy and completeness of any information furnished by the Policyholder or an Insured Person.  Our interpretation of the Policy as to the amount of benefits and eligibility shall be binding and conclusive on all persons.

*Id.*, AR 51.  Further, the SPD provides that the "persons with authority to change, including the authority to terminate, the Plan or the Policy on behalf of the Policyholder are the Policyholder's Board of Directors or other governing body, or any person or persons authorized by resolution of the Board or other governing body to take such action." *Id.*

To qualify for disability benefits, a claimant must demonstrate that he or she is disabled within the meaning of the Policy.  *See, e.g.*, *id.*, AR 37.  The Policy provides that United of Omaha will pay benefits upon receipt of an "acceptable proof of loss" and that benefits will continue until the claimant fails to provide United of Omaha with "satisfactory proof" that the claimant is disabled.  *Id.*, AR 37-43.  Under the Plan, "total disability" is defined as follows:

> Total Disability and Totally Disabled . . . means that because of an Injury or Sickness:
>
> (a) You [the beneficiary] are unable to perform all of the material duties of Your regular occupation on a full-time basis; and

3

(b) You are unable to generate Current Earnings which exceed 20% of Your Basic Monthly Earnings due to that same Injury or Sickness; and

(c) after a Monthly Benefit has been paid for 2 years, You are unable to perform all of the material duties of any gainful occupations for which you are reasonably fitted by training, education or experience.

*Id.*, AR 25.   The Policy further provides, under the heading "Proof of Loss Requirements," that:

1.  You can meet the proof of loss requirement by giving Us [United of Omaha] a written statement of what happened.  Such statement should include:

(a) that You are under the Regular Care of a Physician;

(b) the appropriate documentation of Your job duties at Your regular occupation and Your Basic Monthly Earnings;

(c) the date Your Total and/or Partial Disability began;

(d) the cause of Your Total and/or Partial Disability;

(e) any restrictions and limitations preventing You from performing Your regular occupation;

(f) the name and address of any Hospital or institution where You received treatment, including attending Physicians.

2. Next, You and Your employer must complete and sign Your sections of the claim form, and then give the claim form to the Physician. Your Physician should fill out his or her section of the form, sign it, and send it directly to us.

*Id.*, AR 42.  Further, the Policy states that United of Omaha "sometimes require[s] that a claimant be examined by a Physician or vocational rehabilitation expert of Our choice," and that United of Omaha will pay for the examinations.  *Id.*, AR 43.  The Policy also provides that benefits would cease to an insured person receiving benefits on "the day You fail to comply with Our request to be examined by a Physician and/or vocational

rehabilitation expert of Our choice."  *Id.*, AR 37.  The Policy also sets forth Disability Claim Review Procedures (As Federally Mandated)" and procedures for appeal of an adverse decision.  *Id.*, AR 44-47.

B.  Plaintiff's Medical History

Records show Vicki Johnson ("Johnson") had complained of neck pain as far back as 1994.  Filing No. 32, Admin. Rec. Part II at AR 505.  Following a lengthy conservative course of treatment and EMG diagnostic study, she underwent bilateral carpal tunnel release surgery in 1994-95.  *Id.*, Admin. Rec. Part I at AR 226-7.  She returned to work June 26, 1995.  Within two weeks she was diagnosed with possible cervical disc problems causing posterior shoulder and upper arm pain.  *Id.*, AR 227. Her  neck and shoulder pain was also treated in 1997.  *Id.*, AR 241, 152-57.

On June 9, 2003, she was diagnosed with cervical spondylosis with stenosis and bone spurring from C5-6 through C7-T1.  *Id.,* Admin. Rec., Part II at AR 447.  She reported intermittent numbness to her hands for several years with pain and a burning sensation.  *Id.,* AR 445.  She also reported chiropractic treatment.  *Id.*  Her bilateral carpal tunnel surgery had not resolved the hand symptoms.  *Id.*, AR 442-448.  She had also undergone a conservative course of physical therapy with no relief of symptoms. *Id.*, AR 439-441.  Previous medications included Advil, Flexeril, Xanax, Vioxx and multiple NSAIDs.  *Id.*, AR 445.

A nerve study in 2004 showed "electrodiagnosis evidence of a chronic cervical polyradiculopathy involving bilateral C6 and left C7 nerve roots suggesting that there is permanent nerve injury in the arms at this point."  *Id.*, AR 191.  The permanent nerve

damage was caused by "disk material extending into each neuroforamen," "central disk protrusion," and "Ligamentum Flavum Hypertrophy."  *Id.*, AR 191-92.

In June 2004, the plaintiff had spine surgery for "symptomatic cervical spondylosis with stenosis of C4-5, C5-6 and C6-7."  *Id.*, AR 421.  She underwent:  "(1) Anterior cervical discectomy and decompression of C4-5, C5-6, and C6-7; (2) Anterior interbody fusion C4-5, C5-6, and C6-7; (3) Anterior interbody space C4-5, C5-6, and C6-7; (4) Small effused bone morphogenic protein; (5) Local bone graft."  *Id.,* AR 423. Dr. McClellan testified under oath that Johnson's surgical procedure was "a removal of the disk at three levels, the C4/5, C5/6 and C6/7.  A fusion of those three sites from C4 to C7, and the fusion was completed with bone graft and an anterior plate."  *Id.,* AR 192. The record reflects that the interbody spacers, graft and plate are held together with eight surgical screws.  *Id.*, AR 423-24.  He described it as a significant procedure that significantly limits range of motion.  *Id.,* AR 193.  He also stated that Johnson was more likely to need another surgery with the fusion of three vertebrae as a result of "overusing the other disk spaces that have not been fused to do more work after the fusion."  *Id.*, AR 194.  Johnson achieved some relief after the surgery and was able to return to work in 30 days.  *Id.,* AR 157.

In September 2004, Johnson returned to her spine surgeon reporting neck and right shoulder pain.  *Id.,* AR 194.  Dr. McClellan stated that the return of her symptoms three months after surgery indicated a poor prognosis.  *Id.,* AR 194-95.  Six months after the surgery, Johnson was again examined by Dr. McClellan.  *Id.*, AR 196.  She complained of posterior neck, right shoulder and right arm pain.  *Id.*  Dr. McClellan conducted outcome tests, a paper test known as SF36, which showed that her neck

disability index score was a value of 62, which suggests a high/moderate disability.  *Id.*, AR 197.  Dr. McClellan described the outcome testing process as a "scientific process intended to elicit from the patient from visit to visit the degree of problems they're experiencing."  *Id.*, AR 197-98.  The tests are standardized by the National Spine Network and are "well-accepted standardized outcome tests that have been validated," similar to functional capacity evaluations.  *Id.*, AR 198-99.  Dr. McClellan testified that based on those objective tests Johnson was "moderately disabled as early as seven months after surgery."  *Id.*, AR 199.

Johnson was treated by Dr. Cochran in 2005 for arthritis in her hands and Achilles tendinitis.  Filing No. 32, Admin. Rec. Part II at AR 502.  At that time, Dr. Cochran noted that Johnson had been prescribed Trazadone, Lortab and Flexeril.  *Id.* In February 2009, Johnson's treating family practice physician, Dr. Cheryl MacDonald, reported that Johnson was "having pain all the time into her neck, into her arms, into her hips, and in her side. . . . Her chronic pain continues to worsen."  Filing No. 32, Attachment 3, Admin. Rec. Part I at AR 293.  Dr. MacDonald's assessment was: "1) Anxiety and depression; 2) Fibromyalgia and chronic pain."  *Id.*

Johnson applied for short-term disability on February 26, 2009.  Filing No. 32, Attachment 4, Admin. Rec. Part III at AR 604-05.  In the Attending Physician Statement section of the claim completed on March 3, 2009, under "Subjective/Objective Findings," Dr. MacDonald wrote:   "Pain-neck, hips, shoulders, some legs, panic attacks, depression, trouble with memory, concentration," listing as contributing conditions "neck fusion, arthritis."  *Id.*, AR 488.

Johnson was again seen by her family physician, Dr. MacDonald, on June 19, 2009. *Id.,* AR 129-30.  She reported pain in her arms and was prescribed Lyrica for pain and Neurontin for nerve pain.  *Id.*  Dr. MacDonald observed that Johnson was "really struggling" and had "incredible problems with her neck and arms," to the point that she could not "stand for over 15 minutes, cannot hold or bend without having significant pain" and was "unable to complete any tasks."  *Id.,* AR 289.  Dr. MacDonald noted that Johnson was "[o]bviously uncomfortable" and it was difficult to examine her neck."  *Id.,* AR 289.  Dr. MacDonald's diagnosis was "[n]eck pain with radicular symptoms."  *Id.*  The doctor's notes show that Johnson was "trying to avoid narcotics and muscle relaxants."  *Id.,* AR 289.  On physical examination, Dr. MacDonald noted that there was "definitely atrophy of the deltoid on the left versus the right."  *Id.*  Dr. MacDonald's notes indicate that Johnson was "unable to consistently do anything or even participate with activities with her children and grandchildren."  *Id.*  Dr. MacDonald's plan was to try Solu-Medrol/Medrol Dosepak to slow down swelling and discomfort, continue with anti-inflammatories, and consider neurosurgery evaluation.  *Id.*

Johnson returned for further treatment on October 12, 2009.  Dr. MacDonald conducted a physical examination involving fibromyalgia trigger points as described by the Mayo Clinic and found Johnson was tender at all 18 points.[2]  *Id.,* AR 287**.**  Dr.

---

[2] Fibromyalgia is a rheumatic disease with symptoms that include "significant pain and fatigue, tenderness, stiffness of joints, and disturbed sleep."  *DuPerry v. Life Ins. Co. of North Amer.*, 632 F.3d 860, 863 n.1 (4th Cir. 2011); Stedman's Concise Medical Dictionary for the Health Profession 361 (4th ed. 2001) (defining fibromyalgia as "a condition of chronic diffuse widespread aching and stiffness affecting muscles and soft tissues; diagnosis requires 11 of 18 specific tender points. . . ."); *Meraou v. Williams Co. Long Term Disability Plan,* 221 Fed. Appx. 696, 705 (10th Cir. 2007) (stating that "Fibromyalgia is a disorder characterized by achy pain, tenderness and stiffness of muscles, areas of tendon insertions and adjacent soft-tissue structures").  Fibromyalgia is diagnosed "based on tenderness of at least eleven of eighteen standard trigger points on the body."  *DuPerry*, 632 F.3d at 863 n.1.  The "trigger point" test is

MacDonald's assessment was "Fibromyalgia per testing points positive" and "Depression, still struggling.  Mood severe and ongoing."  *Id.*  Dr. MacDonald's notes indicate that "we discussed Cymbalta[3] as another viable option but currently [she is] without insurance [and it] is not financially a viable option."  *Id.* at AR 287.

Dr. MacDonald thereafter completed a Long Term Disability Claim Physician's Statement noting Johnson had the following restriction and limitations:

> Unable to lift more than 15lbs.
> No push/pull/lean/reach
> Avoid sources of stress
> Not able to work @ computer
> Can't sit or stand for any length of time
> Unable to walk for > 1 hour in a day.

*Id.,* Admin Rec. Part II at 495.  Dr. MacDonald also restricted Johnson's use of her hands in repetitive activities, use of feet in repetitive movements, and restricted bending, squatting, crawling, climbing, and reaching above shoulder level.  *Id.*  Further, Dr. MacDonald noted that Johnson's neck symptoms were expected to deteriorate.  *Id.*

After she applied for disability, Johnson was examined on May 12, 2010, by her spine surgeon, Dr. John McClellan.  *Id.*, AR 132-35.  He noted that she presented with "complaints of pain in the neck and down the upper extremities with parasthesias and some weakness, right greater than left."  *Id.* at AR 132.  Dr. McClellan's examination

---

recognized in the case law and the medical literature as a prerequisite to a diagnosis of fibromyalgia.  *See Chronister v. Baptist Health, 442 F.3d 648, 656 (8th Cir.2006)* (discussing the trigger point test); *Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 919 (7th Cir. 2003)* (noting that the condition can be objectively diagnosed by examining for pain 18 trigger points on the body).  The Eighth Circuit Court of Appeals recognizes that trigger-point test findings consistent with fibromyalgia constitute objective evidence of the disease.  *Johnson v. Metro. Life Ins. Co., 437 F.3d 809 (8th Cir. 2006).*  Fibromyalgia can be treated by a primary care physician but is often detected by a rheumatologist.  *See* http://www.rheumatology.org/practice/clinical/patients/diseases_and_conditions/fibromyalgia.asp

[3] Cymbalta is an anti-depressant that has been approved by the Food and Drug Administration for the management of diabetic peripheral neuropathic pain and fibromyalgia.  *See* http://www. cymbalta.com/Pages/cymbaltaandfibromyalgia.aspx

revealed arm weakness and "diffuse pain over the cervical bony and soft tissues" with "moderately limited range of motion of the cervical spine in all planes." *Id.* He ordered CT and MRI imaging to "evaluate adjacent stenosis at C7-T1," and noted that Johnson was "disabled from [her] neck problem," commenting that she had "increasing symptoms down the arms and numbness and tingling into the 4th and 5th digit." *Id.*

On May 24, 2010, Dr. McClellan reviewed the imaging reports and physician's assistant Erin Strufing discussed the findings with Johnson. *Id.*, AR 140. Strufing's notes indicate that the MRI scan showed Johnson "has disc herniations at T1-2 and T2-3. This correlates with her upper back pain, the pain that radiates underneath her axilla and around her rib cage. She also does have some numbness, tingling down the upper extremities." *Id.* Notes also indicate that Johnson was told that treatment for her condition would be very difficult and would "involve an anterior fusion C7-T3 which would be technically very difficult followed by a posterior spine fusion at C4 down through T3." *Id.* Further, she noted that Johnson was "relieved to know that we have explained the source for the significant pain that she experiences every day" and that "[t]he patient would like to call back when she has medical coverage. She pays out of pocket currently for this." *Id.* Mrs. Johnson later testified that she had to pay $5,000 in advance for her Spine Center appointment and tests. *Id., AR 179-80.*

Johnson visited her primary care doctor, Dr. MacDonald, on June 22, 2010. *Id.*, AR at 129. Dr. MacDonald's notes indicate she prescribed an anti-inflammatory, a muscle relaxant, and Lyrica and Neurontin for nerve pain. *Id.,* AR 130. Dr. MacDonald's findings indicated "half arm numb and pain in arms." *Id.* Her "plan" noted "gabapentin," "flexeril," and "Norco.*" Id.*

In his August 23, 2010, sworn statement, Dr. McClellan testified that Johnson has moderate to severe stenosis in multiple locations, suggesting that she has a "fairly aggressive degenerative process" involving the majority of the neck and extending into the upper thoracic spine."  *Id.*, AR 203-04.   A CT scan shows her spinal canal is moderately to severely narrowed in the upper thoracic spine.  *Id.,* AR 203-04.  He stated that her "neck problem [was] now compressing the nerves again and it's even more widespread than when we started."  *Id.*  The condition would be expected to cause symptoms including myelopathy, moderate to severe neck pain, headaches and radicular symptoms.  *Id.*, AR 204.  He testified that Johnson's complaints are consistent with the findings on the MRI and CT scans.  *Id.,* AR 209.  Based on his experience and on a research project he conducted, he stated that people with radicular symptoms like Johnson are most likely to be disabled and would be expected to have pain even from activities of daily living.  *Id.* at 209-212.  Pain at a level of 8 to 10 on a scale of 10 is also consistent with the condition.  *Id.*  at 212.   Dr. McClellan also stated that "Vickie has no pain-free days" and that "Sitting at a computer, working on a keyboard, looking at a computer in one position for any length of time would be very difficult for Vicki."  *Id.*, AR 210.  He concluded she is "significantly impaired by this condition."  *Id.,* AR 212.

Dr. McClellan explained that Johnson's 2004 surgery was performed specifically to address her nerve injury and relieve the C-6 nerve pain, which the surgery accomplished, but Dr. McClellan believed that in her case "we underestimated the symptoms that were going to be caused by the adjacent structures . . . the arthritis or the degeneration or the other areas of narrowing."  *Id.*, AR 200.  He stated that the potential surgery to address her current problems would involve "essentially fusing her

entire neck down into the thoracic spine" and that "[a] surgery that is that extensive essentially eliminates the majority of the motion in your neck," accordingly, the surgery is "[o]nly done in extreme cases." *Id.,* AR 208. He further stated that other treatments are "just coping mechanisms [that] will never fix the problem." *Id.* Based on her status six months after the surgery, he stated the doctors "knew it would not be a good outcome" and that they "could have anticipated or expected this type of result several years down the road." *Id.*, AR 209. He noted her pain "makes perfect sense" and "her complaints are realistic given the findings on the CT and MRI." *Id.,* AR 209. He stated a person with Johnson's condition would be "[d]ramatically affected by it" and that his patients with persistent arm pain, persistent limb symptoms, sciatica or radiculopathy are at highest risk for permanent disability that would affect their livelihood. *Id.*, AR 210. His concern is Johnson's progressive arm complaints that suggest she is "slowly developing nerve damage similar to that she had before the first surgery." *Id.* He stated that repeat nerve testing would show this, but would not change the treatment or recommendation. *Id.*

The record also includes the plaintiff's sworn testimony. *Id.*, AR 142-185. Johnson stated under oath that her condition steadily worsened. *Id.,* AR 172. She testified that she now has pain, numbness and tingling that has gradually increased immediately below where fusion was. *Id.*, AR 164-65. She testified the pain is constant and is often at a level of ten on a pain scale. *Id.* She also stated she experiences sharp pain into shoulders and arms, runs down the torso and into rib cage. *Id.* She stated that her typical day includes sitting in a chair with ice on her arms most of the time. *Id.*, AR 177-78. She can perform only minimal housekeeping tasks *Id.*, AR 175. She

testified that she would have gone to her spine doctor earlier but did not have health insurance.   *Id.*, AR 179-80.   She reported taking pain medication, anti-seizure medication, and anti-inflammatory drugs.   *Id.,* AR 174.

At Johnson's counsel's request, a certified vocational rehabilitation counselor prepared a long-term disability report.   *Id.*, AR 215-52.   She reviewed voluminous medical and prescription records, spoke to Johnson by telephone, reviewed questionnaires and inventories filled out by Johnson, and analyzed Johnson's skills and abilities based on her education and experience.   *Id.*, AR 216-21.   At that time, Johnson reported taking Meloxicam, Hydrocodone, Flexeril, Simvastin, Prozac, Trazodone and Gaba Pentin.   *Id.* at 216.   She found that the job definition of "sedentary work" did not necessarily define the job Johnson was required to do as a rent-roll specialist, and found the job would be characterized as light rather than sedentary work.   *Id.*, AR 223. She concluded that Johnson was incapable of working on a full-time basis and would be unable to perform the job she was  doing or any other job within the competitive labor market.   *Id.,* AR 224.   No evidence in the record refutes Ms. Freeman's report.

### C.   Procedural History

The plaintiff first applied for short-term disability benefits on February 26, 2009, indicating she was disabled as a result of "severe depression/anxiety, fibromyalgia and pain syndrome."   Filing No. 32, Attachment 5, Admin. Rec. Part III *at* AR 604-605; Filing No. 32, Attachment 4, Admin. Rec. Part II at AR 487-88.

United of Omaha's internal records show that Johnson's file was referred by Group Disability Analyst Julie Shahan to the Vocational Rehabilitation Department and to a nurse case manager for review on April 3, 2009.   Filing No. 32, Attachment 3,

Admin Rec. at AR 323-24.  An initial review was performed by Sadie Burr, MA, LMHP,[4]

on April 8, 2009.  She reported that Johnson was "diagnosed with Depression, Panic

Attacks, and Fibromyalgia."  *Id.*, AR 324.   The diagnosis category was listed as

"nervous-Mental-Addiction."  *Id.*, AR 325.  Burr concluded:

> It appears Johnson voluntarily terminated her employment due to
> stress and complaints of fibromyalgia pain.  However, it seems she then
> presented to Dr. MacDonald because she was worried and "wanting to try
> for disability".  There's no indication that Johnson is psychiatrically unable
> to perform the essential duties of her job.  The records clearly indicate that
> she quit her job because she was "unable to handle it."

*Id.,* AR 324.  On April 13, 2009, Julie Shahan wrote to Johnson, informing her that the

short-term disability claim was denied.  Filing No. 32, Attachment 5, Admin. Rec. Part II

at AR 576.  The letter stated only that the determination had been based on medical

records received from Dr. MacDonald and that "[i]n summary, the documentation

received does not support impairment from performing the essential duties of your job."

*Id.*

On May 12, 2009, Johnson wrote to Julie Shahan at United of Omaha regarding

United's decision to deny her request for disability benefits.  *Id.,* AR 466, 568-71.  In the

letter, Johnson explained that her depression was a byproduct of Fibromyalgia and neck

pain.  *Id.*, AR 569.  United of Omaha's internal records show that a file was opened on

Johnson's appeal of her short-term disability claim on August 11, 2009.  Filing No. 32,

Attachment 3, Admin. Rec. Part I at 326.  At that time the file was referred by Chris

---

[4] LMHP stands for Licensed Mental Health Practitioner.

Rodenbiker for physician review by Dr. Timothy Tse., MD, MBA, FAPA.[5]   *Id.*   He was

asked to review:

> additional medical records submitted to include an updated office note
> from Dr. MacDonald, prior medical history from Dr. Cochran from 11/15/94
> to 02/07/05, and prior medical history from Dr. McClellan from 06/09/03 to
> 09/08/05, as well as the CH [certificate holder's] letter of appeal.   She
> requests reconsideration of benefits upon appeal as she believes her
> neck, arm, and shoulder pain, fibromyalgia, contributed to her depression
> and resulting inability to work.   No counseling notes were submitted upon
> appeal.

Filing No. 32, Attachment 3, Admin. Rec. Part I at AR 326-27.   On August 24, 2009, Dr.

Tse responded that he needed additional medical records to establish the diagnoses of

fibromyalgia, depression, and panic attack/anxiety.   *Id.*, AR 328.   There is no evidence

that additional records were ever provided to Dr. Tse.   *See id.*, AR 336.

United of Omaha's internal notes in the summer of 2009 indicate that some of

Johnson's medical records were lost or misplaced.   Filing No. 32, Attachment 4, Admin

Rec. Part II at AR 560-62; Attachment 3, Admin. Rec. Part I at AR 336.

On September 1, 2009, in a letter signed by Chris Rodenbiker, Appeals and

Resolution Specialist, United of Omaha denied Johnson's appeal of the denial of short-

term disability benefits.   *Id.*, AR 499-500.   In the denial letter, Rodenbiker stated:

"According to the information in your file, you stopped working as a Rent Roll Specialist

February 26, 2009, due to . . . fibromyalgia. . . .   Your medical records from Dr. Cochran

and Dr. McClellan do not support a diagnosis of fibromyalgia and there is very little

medical evidence to support a diagnosis of depression, panic attack, or anxiety" and

concluded, "[i]n summary, the documentation in your file does not support any functional

---

[5] FAPA stands for Fellow, American Psychiatrist Association.   Dr. Tse is a psychiatrist.

or global psychiatric impairments that would have prevented you from performing the material duties of your regular job." *Id.* The letter discussed only psychiatric impairments and did not address either chronic neck pain or fibromyalgia *Id.*

Johnson also filed a Long Term Disability (LTD) Claim, and United of Omaha received the claim on October 15, 2009, and opened a file for the claim in December 2009. Filing No. 32, Attachment 3, Admin. Rec. Part I at AR 56; Attachment 4, Admin. Rec. Part II at 494-95 The LTD Claim Physician's Statement, completed by Dr. MacDonald, indicates a primary diagnosis of Depression and Chronic Pain Syndrome." *Id.*, AR 494. Correspondence dated January 18, 2010, indicated that United of Omaha was awaiting medical records from Dr. MacDonald. *Id.*, Attachment 3, Admin. Rec. Part I at AR 305.

United of Omaha's internal notes show that on February 10, 2010, the claim was referred to a nurse case manager for review. *Id., AR 58, 339.* In the referral, Group Disability Management Services employee Sophie Feng states that "The current restrictions and limitations, as indicated in the medical records, for the Insured are; sit< 2 hrs, Stand < 1 hr and walk < 2 hrs in 8 hrs period, lifting< 15 lbs, uses hands and feet repetitively, banding, squatting, climbing, crawling, reach above shoulder." *Id.* at 339. Carol Johnson, RN, BS, reviewed the claim and stated in her medical analysis dated February 19, 2010, that:

> it appears from the records that the claimant terminated her employment due to stress and complaints of fibromyalgia pain. There is no new treatment for her complaints of her fibromyalgia other than medications from 02/26/09-10/12/09. The records indicate that she quit her job because she was "unable to handle it" which appears to be due mainly to a condition other than her fibromyalgia. It was noted that the claimant had

this condition, fibromyalgia, that it was chronic, and that she had been working with it prior to her quitting her job.

*Id.,* AR 340.   Nurse case manager Johnson reviewed the following records:   "Office notes from Dr Cheryl MacDonald dated from 02/26/09-10/12/09, Office note from Dr Patrick McCarville, MD dated 10/21/09, Attending Physician's statement from Dr Cheryl MacDonald dated 10/12/09."  *Id.* at 339.

The record shows the claim was also referred to Nervous and Mental Health Coordinator Sadie Burr, MA, LMHP, NCC, for review, noting that "all known medical records have not been received to date."  *Id.* at 335.  Ms. Burr was asked to determine "if the restrictions, limitations and the mental capacity the Insured's physician(s) has indicated the Insured is capable of performing, is supported by the medical documentation" and if not, to "identify the mental capacity the Insured should be capable of performing and if there would be any specific restrictions and limitations." *Id.*, AR 337.  Ms. Burr noted that Dr. Tse had requested additional documentation and that information requested in August 2009 had not yet arrived, and concluded that "it seems pertinent to gather such information before a full review can be completed."  *Id.*, AR 336.  Further, the recommended handling of the file "changed format to a walk-up." *Id.*  The diagnosis category was listed as "Nervous-Mental-Addiction" and the result of the review was "need additional info."  *Id.*

The claim was also referred on December 18, 2009, to "rehab," specifically to Kim Rhen, MS, for an occupational review.  *Id.,* AR 330.  Rhen reviewed the job

description provided by Johnson's employer[6] and compared it with the Dictionary of Occupational Titles. *Id.* She concluded that the job was comparable to that of a bookkeeper and would be characterized as a sedentary physical demand job. *Id.* The occupational review, however, shows that physical demands of sedentary work include lifting up to 10 lbs. occasionally and a negligible amount frequently. *Id.,* AR 331. Sedentary work also involves frequent reaching, handling, and fingering. *Id.*

On March 3, 2010, United of Omaha sent a letter to Johnson denying the claim. *Id.,* AR 259-61. The letter stated "you are claiming disability for fibromyalgia, depression and anxiety." *Id.* United of Omaha acknowledged Johnson was "tender on all 18 fibromyalgia points, but stated "[h]owever there is no other test and no new treatment for your fibromyalgia." *Id.,* AR 261. On August 27, 2010, Johnson, through counsel, appealed the denial. *Id.,* AR 122-27.

United of Omaha's internal records dated November 18, 2010, refer to "1st Appeal," and show the file was referred to nurse case manager Nancy Rosenstock, RN, BSN, COHN-S CLNC, for review. *Id.,* AR 343. The referral states "The APS [attending physician statement] completed by Dr. MacDonald on 2/27/09 gives DX [diagnosis] of depression, panic attacks & fibro." *Id.*

---

[6] The employer's job description stated:

While performing the duties of the job, the employee is frequently required to use hands and fingers to operate a computer keyboard, mouse, 10 key calculator, and telephone to talk or hear. The employee is occasionally required to stand, sit, carry items, and reach with hands and arms. The employee must occasionally lift and/or move up to 15 pounds or more. Specific vision abilities required by this job include close vision, color vision, and ability to adjust focus.

*Id.,* AR 275.

On review, Rosenstock recommended on December 8, 2010, that the file be sent for an external peer review by an Orthopedic Spine Surgeon.[7]  *Id.*  Nurse Rosenstock recommended that the peer reviewer be asked to identify "what significant change occurred, if any, in claimant's overall physical status, as of February 2009, which would have precluded her from being able to sit up to 6 hours out of an 8 hour day and lift up to 10 lbs., per Department of Labor guidelines?"  *Id.*

United of Omaha then referred Johnson's file and medical records to a consulting specialist for review.[8]  *Id.*, AR 345.  The specialist, Dr. James Boscardin, an orthopedic surgeon, was asked to "[r]eview all records including video surveillance (if provided)" and to determine "the medical conditions that are supported by this information," to "[d]ocument any consistencies and inconsistencies in the diagnosis, treatment, and claimed impairment," to answer the question set forth above and "to determine whether the restrictions and limitations provided by the attending physician were supported." Filing No. 32, Attachment 5, Admin. Rec. Part 3, AR 624-27.

Dr. Boscardin reviewed Johnson's medical records and other information supplied by United of Omaha.[9]  *Id.*, AR 95.  In response to the query, "What medical

---

[7] Interestingly, internal records also include a blank referral document with a Diagnosis Category listed as "Musculoskeletal-Connective Tissue-Rheumatic." *Id.* at 341.

[8] In December 2010, Johnson's counsel wrote to United of Omaha expressing concern over the length of time the appeal had been pending, noting that "when Mrs. Johnson needed more time prior to filing her appeal, [the defendant] refused." *Id., AR 109.

[9] Specifically, Dr. Boscardin stated that he reviewed:

1. Job Description
2. Reviewed a document from Resolutions, Inc., authored by Paulette Freeman on 8/27/10.
3.  Reviewed letters from Attorneys Lathrop from 8/27/10 and 12/6/10.
4  Reviewed sworn statements by Dr. McClellan on 8/23/10
5.  Reviewed sworn statements from the claimants on 8/05/10.

diagnoses are supported by this information?", Dr. Boscardin stated that "The claimant has a chronic pain problem associated with her neck, upper thoracic spine and right upper extremity.  This is mainly based on self-reported complaints and the physical exam does not reveal any specific atrophy, loss of strength, or sensation abnormalities," explaining that "[h]er Imaging Studies are not specific to explain her ongoing complaints. It appears, after review of the medical records, including Imaging and physical exams, that this represents a situation where the claimant is offering multiple physical complaints without conclusive, objective evidence to support the claim."  *Id.*, AR 197-98. He based his finding on Johnson's failure, despite her complaints, to return to her operating surgeon from December 2004 to May of 2010.  *Id.*, AR 198.  Further, he stated that the "use of pain medication on an ongoing, more consistent, basis would appear to be appropriate treatment for any impairing condition with this claimed degree of severity and chronicity, but none is noted."  *Id.*  Also, he noted, "[t]he medication and its ingestion also leaves me unsettled in that someone complaining of pain at eight to ten level is not requiring a greater degree of medication."  *Id.*

He found that Johnson had "some ongoing restrictions and limitations that would limit repetitive extension of her neck, lifting over 10 lbs., and no twisting activities with

---

6. Reviewed the medical records of Dr. Cochran from 11/15/94 through 2/7/05.
7. Reviewed the medical records of Dr. John McClellan from 6/9/03 through 5/24/10.
8. Reviewed the medical records of Excel P.T. 6/18/03 and 7/17/03.
9. Reviewed MRs of the cervical spine performed on 4/1904 and 5/20/10.
10. Reviewed cervical CT reports for 9/8/05 and 5/20/10.
11. Reviewed EMG report performed by Dr. Devney 4/28/04.
12. Reviewed the Operative Report 6/8/04 of the anterior cervical decompression and fusion.
13. Reviewed the medical records of Dr. MacDonald from 2/26/09 through 6/27/10.

*Id.*, AR 95-96.

the cervical spine." *Id.* He found the claimant can sit "unlimited with change of position as needed." *Id.* Dr. Boscardin concluded:

> After review of the medical records provided, I am not convinced that there has been an adequate explanation for her continued complaints of pain. Clearly, her records, including physical exams do not support significant functional limitation beyond a sedentary level. The Imaging results are not unusual in her age group and often Imaging of the thoracic spine is noted to show lesions which have very little clinical correlation. A lesion at T1, T2 is not in any way going to cause headaches or cause pain or symptoms in the right arm.

*Id.* He stated that Johnson's diagnoses were "based on self-reported complaints and the physical exam does not reveal any specific atrophy, loss of strength, or sensation abnormalities." *Id.* at 621. He found the attending physician's restriction and limitations were not supported by the medical evidence, stating "I do not believe that claimant can't work with a computer, cannot stand for any length of time, and can sit for only one hour a day." *Id.*, AR at 623. Also, he could identify no change in her physical status in February 2009 that would have precluded her "from being able to sit up to six hours out of ten hours a day and lift to ten pounds per Department of Labor Guidelines." *Id.*, AR 622.

Notably, he stated that his opinion was "solely based on the musculoskeletal issues and does not take into consideration panic attacks or depression." *Id., AR* 95. He acknowledged that Johnson was diagnosed as having fibromyalgia, but made no further mention of the disease. *Id.* at 96-98. Dr. Boscardin was paid $1,695.00 for the file review. *Id.*, AR 78-79.

Nurse Rosenstock subsequently approved Dr. Boscardin's opinion. *Id.*, AR 348. Filing No. 32, Attachment 3, Admin Rec. Pt. 1, AR 348. The peer review report was

faxed to Dr. McClellan for his review. *Id.*, AR 105, 107; 63. Dr. McClellan was asked his "opinion on the results of the exam, particularly regarding the patient's work capacity," specifically, if he believed Johnson could perform a job with physical demands of "frequently using hands and fingers to operate a computer keyboard, mouse, 10-key calculator and telephone. She would be required to occasionally stand, sit, carry items and reach with hands and arms. She would be required to occasionally lift and/or move up to 15 pounds or more." *Id.,* AR 105. Dr. McClellan responded that "[o]verall, [he] agree[d] with Dr. Boscardin's opinion," noting that it was recommended that she see a physical medicine and rehab pain specialist. *Id.*, AR 102. He did not answer the question regarding work capacity. *Id.*

United of Omaha denied Johnson's appeal on January 28, 2010, stating "[w]e acknowledge the fact that Johnson has a history of cervical discectomy and fusion of C4-C7 in 2004 and would have some restrictions as a result of that surgery. However, the medical information does not document functional impairment that would prevent her from performing the duties of her occupation." *Id.*, AR 93.

## II.  LAW

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Aviation Charter, Inc. v. Aviation Research Group/US*, 416 F.3d 864, 868 (8th Cir. 2005). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004). Under ERISA, when a denial of benefits is challenged through judicial review, "the record that was before the administrator furnishes the primary basis

for review." *Trustees of Electricians' Salary Deferral Plan v. Wright*, 688 F.3d 922, 925 (8th Cir. 2012); *see also Brown v. Seitz Foods, Inc., Disability Benefits Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998) (suggesting a district court should ordinarily limit its review to the evidence contained in the administrative record).

The underlying purpose of ERISA is to protect the interests of participants in employee benefit plans and their beneficiaries. 29 U.S.C. § 1001(b); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989). Under ERISA, a plan "participant or beneficiary" may bring a "civil action" to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *see CIGNA Corp. v. Amara*, — U.S. —, —, 131 S. Ct. 1866, 1871 (2011).

An administrator's decision is reviewed for an abuse of discretion when an ERISA plan grants discretionary authority to the plan administrator to determine eligibility for benefits. *Jobe v. Medical Life Ins. Co.*, 598 F.3d 478, 481 (8th Cir. 2010); *Bruch*, 489 U.S. 115. However, the district court should apply a de novo standard of review, rather than an abuse of discretion standard, when the "administrator did not exercise the discretion granted to it." *Alliant Techsystems, Inc. v. Marks*, 465 F.3d 864, 868 (8th Cir. 2006). A less deferential standard of review (de novo review) is also appropriate where there is material, probative evidence demonstrating that a serious procedural irregularity existed that caused a serious breach of the plan administrator's fiduciary duty. *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998), *abrogated in part by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008); *see Wrenn v. Principal Life Ins. Co.*, 636 F.3d 921, 924 n.6 (8th Cir. 2011) (recognizing "[a]fter the Supreme Court's

decision in *Glenn*, the *Woo* sliding-scale approach is no longer triggered by a conflict of interest," but "[t]he procedural irregularity component of the *Woo* sliding scale approach may . . . still apply in our circuit post-*Glenn*); *Wade v. Aetna Life Ins. Co.*, 684 F.3d 1360, 1362 n. 2 (8th Cir. 2012).

Summary plan descriptions form part of the written documents required by ERISA and will prevail "in cases where the summary granted a beneficiary certain rights or privileges that the policy did not." *Jobe*, 598 F.3d at 481 (emphasis added). However, an SPD cannot grant a plan administrator discretion to determine eligibility for benefits when the plan itself does not. *Id.* at 481-86. A grant of discretion to an administrator is a critical provision. *Id.* at 483-84 (stating that "a grant of discretion to the plan administrator, appearing only in a summary plan description, does not vest the administrator with discretion where the policy provides a mechanism for amendment and disclaims the power of the summary plan description to alter the plan."). "The policy's failure to grant discretion results in the default de novo standard." *Id.* at 486 (noting that due to the policy's silence in the face of a decades-old Supreme Court ruling establishing a default de novo standard of review, the summary plan description does not summarize a provision of the policy related to discretion, but instead enlarges the administrator's authority). In the Eighth Circuit, the policy will control over the inconsistent grant of discretion to the administrator in the summary plan description. *Id.*; *see also Ringwald v. Prudential Ins. Co. of Amer.*, 609 F.3d 946, 949-50 (8th Cir. 2010) (finding de novo review appropriate where "there are no terms in the plan which allow it to be amended by inserting into the SPD such critical provisions as the administrator's discretionary authority to interpret the plan or to determine eligibility for benefits.").

In conducting de novo review, the court gives no deference to the administrator's decision. *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 660 (8th Cir. 1992). The district court is not limited to the fiduciary's explanation of its denial. *Donatelli v. Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir. 1993).

Under the abuse of discretion standard, the court will reverse if the plan administrator's decision is inconsistent with plan goals, renders other terms meaningless, superfluous or internally inconsistent, conflicts with the substantive or procedural requirements of ERISA, is inconsistent with prior interpretations of the same words, or is contrary to the plan's clear language. *Carrow v. Standard Ins. Co.*, 664 F.3d 1254, 1258 (8th Cir. 2012). When the administrator is also the insurer, the administrator has a conflict of interest that must be given "some weight" in the abuse-of-discretion calculation. *Id.* at 1258-59; *Glenn*, 554 U.S. at 118. The significance of this factor depends on the circumstances of the particular case. *Id.*

A plan administrator's decision is an abuse of discretion if it is not supported by substantial evidence. *Wrenn*, 636 F.3d 925. Substantial evidence means "more than a scintilla but less than a preponderance." *Darvell v. Life Ins. Co. of North Amer.*, 597 F.3d 929, 935 (8th Cir. 2010). A plan administrator abuses its discretion when it ignores relevant evidence or fails to "address the extensive medical evidence relating to [the claimant's] disability or the consistent conclusions of her doctors and various [plan administrator] personnel that she could not work." *Wilcox v. Liberty Life Assurance. Co. of Boston*, 552 F.3d 693, 701-02 (8th Cir. 2009) (quoting *Norris v. Citibank, N.A. Disability Plan (501)*, 308 F.3d 880, 885 (8th Cir. 2002)): *see also Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 681 (8th Cir. 2005) (stating that it is abuse of discretion

to ignore evidence that is directly related to a plan's definition of disability").  A plan administrator abuses its discretion when it "focuse[s] on slivers of information that could be read to support a denial of coverage and ignore[s]—without explanation—a wealth of evidence that directly contradicted its basis for denying coverage." *Wilcox*, 552 F.3d at 701-02.  An obligation as an ERISA fiduciary requires more than combing the record for evidence in its favor and abandoning its review upon discovering "more than a scintilla" of such evidence.  *Metropolitan Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (8th Cir. 2007).

A plan fiduciary abuses its discretion in accepting the opinion of a reviewing physician over the conflicting opinion of a treating physician when the record does not support it.  *Midgett v. Washington Group Intern. Long Term Disability Plan*, 561 F.3d 887, 897 (8th Cir. 2009).  However, although an ERISA plan administrator need not accord special deference to a treating physician's opinion, an administrator may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 834 (2003).  Further, an ERISA administrator, though entitled to seek and obtain a professional peer review opinion, "is 'not free to accept this report without considering whether its conclusions follow logically from the underlying medical evidence." *Wilcox* 552 F.3d at 700-01; *see Glenn*, 554 U.S. at 118 (finding a plan administrator had emphasized a certain medical report that favored a denial of benefits, had deemphasized certain other reports that suggested a contrary conclusion, and had failed to provide its independent vocational and medical experts with all of the relevant evidence.).

A Functional Capacity Evaluation ("FCE") provides "objective clinical evidence" regarding how a benefits claimant's medical conditions affect his or her ability to work. *Green v. Union Security Ins. Co.*, 646 F.3d 1042 (8th Cir. 2012). *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004). The Eighth Circuit has endorsed the use of FCEs in evaluating the effect of fibromyalgia on ERISA benefits claimants. *See, e.g., Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 841 (8th Cir. 2006) (stating plaintiff's failure to submit an FCE in support of her disability may have affected the benefits determination); *Farfalla v. Mutual of Omaha Ins. Co.*, 324 F.3d 971, 974 (8th Cir. 2003) (stating functional capacity assessment that indicated plaintiff was not disabled supported plan administrator's benefits denial decision).

If a plan requires a claimant to provide "documented proof" and "satisfactory documentation" of a disability, but does not define what sort of proof or documentation is "satisfactory," the administrator "is entitled to define those ambiguous terms as long as its interpretation is reasonable." *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 841 (8th Cir. 2006).

### III. DISCUSSION

The court finds that the policy does not give discretion to United of Omaha to construe the terms of the plan. The grant of discretion in the SPD cannot be afforded effect under Eighth Circuit precedent. Therefore, it would be appropriate to review United of Omaha's denial of benefits under the *de novo* standard of review. Further, *de novo* review is warranted because there were considerable procedural irregularities in

the review of Johnson's claims for short- and long-term disability benefits.[10]  That finding

is of no consequence, however, because even under the more deferential standard, the

court finds United of Omaha's actions are unreasonable and an abuse of discretion.

Considering the record as a whole, there is no reasonable basis for United of

Omaha's denial of Johnson's claim.  In making this determination, the court gives some

weight to the structural conflict of interest presented here by virtue of United of Omaha's

dual role as insurer and administrator of the plan.  The record shows that Johnson

suffers from chronic and progressive diseases that are potentially debilitating.  She has

presented substantial evidence from her treating physicians that these diseases do, in

fact, prevent her from working.  She has presented her own sworn testimony and the

testimony of her spine surgeon attesting to the severity of her symptoms.  Her

subjective complaints of pain are fully supported by objective evidence that she has

permanent nerve damage in her arms, has three fused discs, three presently herniated

discs, fibromyalgia,[11] some degree of mental illness and moderate to severe arthritis in

her spine.

The only evidence to controvert the evidence of substantial disabling conditions

is the peer review report by Dr. Boscardin.  United of Omaha's decision to credit the

opinions of Dr. Boscardin over other medical evidence is questionable for several

---

[10]  The record shows that United of Omaha initially failed to consider evidence of Johnson's physical disabilities and processed her claim as one for disability by reason of mental health.  It continued to focus on mental health as the reason for her disability in the face of evidence that clearly showed her primary complaint was neck pain.  Claims reviewers repeatedly mischaracterized medical and vocational evidence.  Further, it appears that United of Omaha lost or misplaced medical records, failed to timely process the claims, failed to resubmit additional evidence to a physician for review, and generally gave Johnson and her counsel "the run-around."

[11]  The record contains objective evidence that fully supports a diagnosis of Fibromyalgia—the 18-point trigger test.

reasons.  First, unlike Drs. McClellan and MacDonald, Dr. Boscardin did not physically examine Johnson; he only reviewed her some of her medical records.  His analysis of those records does not support the conclusion that the combined effects of symptoms of Johnson's diagnosed fibromyalgia, herniated discs, nerve damage, radiculopathy, depression, panic attacks and anxiety are not sufficiently severe as to prevent her from working.  United of Omaha is authorized under the contract to require a claimant to undergo a physical examination.  United of Omaha did not do so.

Also, in the peer review report, Dr. Boscardin mischaracterizes the medical evidence in several important respects.  His statement that physical examination did not reveal a specific atrophy, loss of strength, or sensation abnormalities is patently false.  The record is replete with evidence of numbness and tingling in Johnson's right arm and objective evidence dating back to 2003 that she had permanent nerve damage.

Next, Dr. Boscardin discounted Johnson's subjected complaints based on the absence of pain medication and her failure to return to her spine surgeon for several years.  The record shows that Johnson has consistently sought medication for her pain.  Over the years Johnson has been prescribed numerous narcotics, muscle relaxants, anti-inflammatories, mood stabilizers, sleep aids, and nerve-pain medications.  She was not able to obtain some medications, i.e., Cymbalta for fibromyalgia, because of cost.  Johnson's reluctance to revisit her surgeon is also explained by lack of resources and insurance coverage and by the fact that the surgeon was of limited assistance.  Dr. Boscardin's reliance on Johnson's failure to undergo an EMG is similarly explained by cost and by Dr. MacClellan's testimony that the test would not change the treatment

plan or outcome in any event.   The record shows that Johnson regularly and consistently visited her primary care physician.

Dr. Boscardin's statement that nothing happened in 2009 that would have made Johnson unable to work is similarly unsupported.  The evidence shows that after her spinal-fusion surgery in 2004, her condition was expected to, and did, progressively worsen.  Her spine surgeon testified that her prognosis after the surgery was poor.  Her latest MRI shows she presently has three herniated discs, a condition that developed sometime between her surgery and her examination in 2010.  Her spine surgeon also stated that Johnson's reports of pain were consistent with the objective evidence and that her condition would be expected to cause excruciating and debilitating pain.  He noted that she had permanent nerve damage even before the surgery in 2004 and suspected that she was experiencing further nerve damage.

Dr. Boscardin did not specifically refute Dr. McClellan's findings, but summarily concluded that her complaints of pain and limited functionality "are not supported" by the medical evidence.   To the contrary, objective records and testimony support Johnson's subjective complaints and support the conclusion that Johnson suffered additional damage to the cervical and thoracic vertebrae that had not been fused.

Importantly, Dr. Boscardin's opinion is expressly limited to consideration of musculoskeletal issues only.   In fact, the opinions of both Drs. MacClellan and Boscardin are constrained by their status as orthopedic surgeons.  A peer review by either an internist or rheumatologist would have been more appropriate to address the fibromyalgia issues.

There is also evidence in the record that could support a finding of some level of mental illness.  United of Omaha's own psychiatrist stated he needed more records in order to complete his review.  Those records were never provided to him.  The consulting physician never addressed either fibromyalgia or mental health issues.  Johnson's mental health issues disappeared from the analysis, along with her fibromyalgia complaints.

The record shows that every medical professional who has actually examined Johnson uniformly accepted that her symptoms were real.  She has a documented history of complaints of neck pain for many years.  She has a stable work history, and there is no evidence that she has been, or is, a malingerer.  She worked steadily for 14 years as rent-roll specialist.

Dr. McClellan's purported "agreement" with Dr. Boscardin's assessment provides little support for United of Omaha's denial of Johnson's claim.  Dr. Boscardin's opinion was limited to musculoskeletal complaints.  It was based on a mischaracterization of the medical record and on a job description that is not supported by the record.  Dr. McClellan had stated at his deposition that he was not in a position to offer an opinion about vocational rehabilitation; his summary agreement should not be construed to include agreement with Dr. Boscardin's purported vocational rehabilitation opinion.  Moreover, Dr. MacClellan's supposed agreement with Dr. Boscardin's report contradicts his own statement that there is "no question" that Johnson is "significantly impaired" by her condition, and the court should afford it little weight.

Tellingly, in approving Dr, Boscardin's report, Dr. McClellan avoided answering United of Omaha's "work-capacity" question.  Neither of the doctors are qualified to

make a vocational assessment.  The vocational assessment by Ms. Freeman is the only evidence in the record that addresses Johnson's impairments from a vocational perspective, taking into consideration the functional limitations.  United of Omaha's reliance on a cursory review by their vocational rehabilitation department is misplaced. Its vocational specialist relied only on the employer's description of job duties, did not review medical records, and did not address functional limitations.  Her review did no more than conclude that a rent-roll specialist is similar to a bookkeeper; it did not address Johnson's impairments or the functional limitations those impairments might impose on her ability to work.  Under the terms of the disability insurance contract, United of Omaha was authorized to request a vocational examination of Johnson.  It did not do so.  There is a failure of proof with respect to United of Omaha's contention that Johnson can perform work.

Dr. Boscardin's conclusions with respect to Johnson's functional limitations are particularly dubious in that he does not dispute that Johnson has numerous severe conditions, but only states that the conditions would not result in pain of sufficient magnitude to preclude work.  He acknowledges that Johnson has limitations, just quibbles about their extent.  Although he concedes that Johnson's history of spinal fusion "would probably call for some ongoing restrictions and that limited repetitive extension of her neck, lifting over ten pounds, twisting activities with the cervical spine," and that those restrictions would be permanent, he did not quantify the restrictions.  *Id.*, AR 98.  There is objective evidence that Johnson suffers from fibromyalgia and has arthritis, a chronic and progressive disease.  United of Omaha's summary treatment of the fibromyalgia condition was to acknowledge that Johnson was "tender on all 18

fibromyalgia points," thus acknowledging the diagnosis, but concluding "there is no other test and no new treatment for your fibromyalgia," which is a completely meaningless statement.  United of Omaha did not assess or analyze the severity of the condition or the functional limitations the illness would impose on Johnson's ability to work.

Further, the unrebutted evidence from a vocational specialist establishes that Johnson's impairments result in functional limitations that preclude even sedentary work.  There is evidence that her former position involved light work.  United of Omaha argues that vocational evidence is not necessary, because there is no objective evidence of functional limitations.  To the contrary, the court finds ample objective evidence, most notably MRI and CT studies and the widely-accepted trigger-point test, as well as the opinions of treating physicians, to support Johnson's complaints of pain that result in functional limitations.  Here, the vocational expert's functional capacity evaluation, based on the medical evidence and reports of Johnson's physicians, supports a disability finding.

In essence, United of Omaha was presented with a certificate holder who had three arguably debilitating problems:  neck and arm pain connected to her spinal fusion; mental illness including depression; and fibromyalgia.  Its review of Johnson's claim addressed only one of those ailments.  United of Omaha simply ignored or lost track of the other two.  Nowhere did it assess Johnson's overall condition or discuss Johnson's objectively supported conditions in combination.  United of Omaha's failure to address those allegedly disabling conditions or to consider Johnson's condition as a whole amounts to an abuse of discretion.  In view of the foregoing, the court finds that United

of Omaha abused its discretion in denying benefits to the plaintiff.  The court finds the record contains evidence that establishes she is disabled.  Accordingly,

IT IS ORDERED:

1.   The defendant's motion for summary judgment (Filing No. 31) is denied.

2.   The plaintiff's motion to strike the declaration of Molly Kuehl (Filing No. 40) is denied as moot.

3.   The plaintiff's motion for summary judgment or, in the alternative, motion for judgment on the administrative record (Filing No. 46) is granted.

4.   Judgment will be entered in favor of the plaintiff and against defendant for disability benefits due under the policy in an amount to be later determined.

5.   The parties shall meet and confer with respect to the calculation of those benefits and report to the court within 21 days of the date of this order.

6.   The plaintiff shall file a motion for attorney fees within three weeks of the date of this order; the defendant shall respond to that motion within 14 days thereafter.

Dated this 11th day of March, 2013.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge